AO 106 (Rev. 04/10) Application for a Search Warrant

# UNITED STATES DISTRICT COURT

for the
Eastern District of Virginia



CLERK, U.S. DISTRICT COURT
ALEXANDRIA, VIRGINIA

| | |
|---|---|
| In the Matter of the Search of | ) |
| *(Briefly describe the property to be searched or identify the person by name and address)* | ) |
| INFORMATION ASSOCIATED WITH ACCOUNT RILEY.CURRY.10 THAT IS STORED AT PREMISES CONTROLLED BY FACEBOOK INC. | ) ) ) ) |

Case No.  1:18-SW-306

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*
See Attachment A

located in the _____Northern_____ District of _____California_____ , there is now concealed *(identify the person or describe the property to be seized)*:
See Attachment B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☐ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. Sections 841 & 846; | Conspiracy to distribute controlled substances; Obstruction of Justice |
| 18 U.S.C. Sections 1512 & 2 | |

The application is based on these facts:
See Attached Affidavit

☐ Continued on the attached sheet.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

Reviewed by AUSA/SAUSA:

| SAUSA David A. Peters |
|---|

_____
*Applicant's signature*

Special Agent Paul Fisher, FBI
*Printed name and title*

Sworn to before me and signed in my presence.

_____/s/_____
Michael S. Nachmanoff
United States Magistrate Judge
*Judge's signature*

Date: ____06/01/2018____

City and state: Alexandria, Virginia

The Honorable Michael S. Nachmanoff
*Printed name and title*

## ATTACHMENT A

### Property to Be Searched

This warrant applies to information associated with the Facebook Inc. ("Facebook")
accounts identified below, for the period January 1, 2016, to April 16, 2018, that is stored at
premises owned, maintained, controlled, or operated by Facebook, a company headquartered in
Menlo Park, California.

Facebook Account and URL

| Facebook Account and URL |
|---|
| Facebook Account: "Riley Curry"<br>URL: www.facebook.com/riley.curry.10 |

## ATTACHMENT B

### Particular Things to be Seized

I.   Information to be disclosed by Facebook

To the extent that the information described in Attachment A is within the possession, custody, or control of Facebook Inc. ("Facebook"), including any messages, records, files, logs, or information that have been deleted but are still available to Facebook, or have been preserved pursuant to a request made under 18 U.S.C. § 2703(f), Facebook is required to disclose the following information to the government for each account listed in Attachment A and for the time period provided in Attachment A:

(a)   All contact and personal identifying information, including full name, user identification number, birth date, gender, contact e-mail addresses, physical address (including city, state, and zip code), telephone numbers, screen names, websites, device identifiers, and other personal identifiers.

(b)   All activity logs for the account and all other documents showing the user's posts and other Facebook activities;

(c)   All photos and videos uploaded by the user of the account and all photos and videos uploaded by any user that have that user tagged in them, including Exchangeable Image File ("EXIF") data and any other metadata associated with those photos and videos;

(d)   All profile information; News Feed information; status updates; videos, photographs, articles, and other items; Notes; Wall postings; friend lists, including the friends' Facebook user identification numbers; groups and networks of which the user is a member, including the groups' Facebook group identification numbers; future and past event postings; rejected "Friend" requests; comments; gifts; pokes; tags; and information about the user's access and use of Facebook applications;

(e)   All other records of communications and messages made or received by the user, including all private messages, chat history, video calling history, and pending "Friend" requests;

(f)     All "check ins" and other location information;

(g)     All IP logs, including all records of the IP addresses that logged into the account; all device identifier logs, including all records of the device identifiers that logged into the account;

(h)     All records of the account's usage of the "Like" feature, including all Facebook posts and all non-Facebook webpages and content that the user has "liked;"

(i)     All information about the Facebook pages that the account is or was a "fan" of;

(j)     All past and present lists of friends created by the account;

(k)     All records of Facebook searches performed by the account;

(l)     All information about the user's access and use of Facebook Marketplace;

(m)     The types of service utilized by the user;

(n)     The length of service (including start date) and the means and source of any payments associated with the service (including any credit card or bank account number);

(o)     All privacy settings and other account settings, including privacy settings for individual Facebook posts and activities, and all records showing which Facebook users have been blocked by the account; and

(p)     All records pertaining to communications between Facebook and any person regarding the user or the user's Facebook account, including contacts with support services and records of actions taken.

(q)     All dates when the account was reactivated, deactivated, disabled, or deleted.

II.     <u>Information to be seized by the government</u>

All information described above in Section I that constitutes evidence of violations of Title 21, United States Code, Sections 841(a)(1) and 846, and Title 18, United States Code, Sections 2

& 1512(c), including, for each account identified in Attachment A, information pertaining to the

following matters:

(a)     Communications, images, or information reflecting the planning or distribution of heroin, fentanyl, or any additional illegal narcotic;

(b)     Address/phone books or contact information that reflect names of potential criminal associates involved in the conspiracy;

(c)     Financial account information and records related to planning or distribution of controlled substances, including, but not limited to, heroin and fentanyl;

(d)     Evidence indicating how and when the Facebook account was accessed or used, to determine the chronological and geographic context of account access, use, and events relating to the crime under investigation and to the Facebook account owner;

(e)     Evidence indicating the Facebook account owner's state of mind as it relates to his involvement in a conspiracy to distribute controlled substances;

(f)     The identity of the person(s) who created or used the Facebook account, including records that may help reveal their whereabouts;

(g)     The identity of co-conspirators, accomplices, and aiders and abettors in the commission of the criminal activity under investigation;

(h)     Images or videos related to the planning or distribution of controlled substances, including, but not limited to, heroin and fentanyl.



IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA

Alexandria Division

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF INFORMATION ASSOCIATED WITH ACCOUNT RILEY.CURRY.10 THAT IS STORED AT PREMISES CONTROLLED BY FACEBOOK INC. | Case No. 1:18-sw-307<br><br>The Honorable Michael S. Nachmanoff |

## AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR A SEARCH WARRANT

I, Paul J. Fisher, being first duly sworn, hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1.      This affidavit is submitted in support of an application for a search warrant for information associated with a Facebook account believed to be subscribed to JOSEPH RILEY CURRY, the account being identified as Riley.Curry.10, which information is stored at premises owned, maintained, controlled, or operated by Facebook Inc. ("Facebook"), a social networking company headquartered in Menlo Park, California.  The information to be searched is described in the following paragraphs and in Attachment A.  This affidavit is made in support of an application for a search warrant under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A) to require Facebook to disclose to the government records and other information in its possession pertaining to the accounts, including information about the subscriber, customer, or user of the account as well as the contents of communications.

2.      I am a Special Agent with the Federal Bureau of Investigation ("FBI"), and have been since August 2012.  I am currently assigned to the FBI's Washington Field Office,

Northern Virginia Resident Agency, and I work on a squad that investigates narcotics trafficking and criminal enterprises.

3.      I have investigated violations of federal and state narcotics laws. I have conducted and participated in numerous narcotics investigations resulting in the arrest and conviction of drug distributors and seizure of controlled substances. Many of these investigations have involved the distribution and use of cocaine, cocaine base (commonly known as crack cocaine), methamphetamine, and heroin. I have received extensive training in drug identification, drug distribution methods, and drug enforcement techniques from both state and federal agencies. As a result, I am familiar with the use, effects, distribution techniques, appearance, and method of manufacture of controlled substances, including cocaine, crack cocaine, methamphetamine, and heroin.

4.      I have participated in the execution of numerous search warrants and have sworn to numerous affidavits in support of arrest warrants and search warrants for illegal narcotics, paraphernalia related to the use of illegal narcotics, monies or proceeds derived from the sale of narcotics, and records

5.      The facts in this affidavit come from my personal observations, my training and experience and information obtained from other agents and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

6.      Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe that JOSEPH RILEY CURRY (CURRY) has violated Title 21, United States Code, Sections 841(a)(1) and 846 by conspiring to distribute heroin and fentanyl, and Title 18, United States Code, Sections 2 & 1512(c), by obstructing or attempting to obstruct

2

justice. There is also probable cause to search the information described in Attachment A for evidence of these crimes, as described in Attachment B.

## PROBABLE CAUSE

7.     In or around October, 2016, the Federal Bureau of Investigation (FBI), the Loudoun County Sheriff's Office (LCSO) and the Leesburg Police Department (LPD) detectives opened an investigation into CURRY's involvement in the distribution of heroin and fentanyl in Loudoun County, Virginia, located in the Eastern District of Virginia. Investigators interviewed two individuals, cooperating defendant 1 (CD-1)[1] and cooperating defendant 2 (CD-2)[2], regarding their dealings with CURRY. Additionally, law enforcement used a Confidential Source (CS-1)[3] to

---

[1] In 2017, CD-1 pled guilty in the Eastern District of Virginia to a one-count criminal information charging him with obstruction of justice in relation to his narcotics relationship with CURRY. CD-1 is cooperating pursuant to a plea agreement with the government in the hopes of receiving a reduction in his adjudged sentence. CD-1 has been cooperating with law enforcement since March 2016. CD-1 has prior state convictions for drug related offenses. CD-1 provided incomplete information in his initial interactions with law enforcement. However, after voluntarily meeting with law enforcement and in proffering pursuant to the plea agreement, CD-1 has provided information, the completeness and validity of which law enforcement has been able to corroborate. CD-1 chose to stop cooperating with law enforcement based on a state charge, the existence of which pre-dated the initiation of CD-1's cooperation before pleading guilty. For these reasons, I consider CD-1's information to be reliable.

[2] In 2017, CD-2 pled guilty in Loudoun County Circuit Court to a felony offense for involuntary manslaughter related to his narcotics relationship with CURRY. CD-2 is cooperating pursuant to a plea agreement with the government in the hopes of receiving a reduction in his adjudged sentence. CD-2 has been cooperating with law enforcement since March 2016. CD-2 has prior state convictions for drug related offenses. The information CD-2 initially provided law enforcement was incomplete. However, after voluntarily meeting with law enforcement and in proffering pursuant to the plea agreement, CD-2 has provided information, the validity and completeness of which law enforcement has been able to corroborate. For these reasons, I consider CD-2's information to be reliable.

[3] CS-1 has been a confidential source since 2016. CS-1 is not facing criminal charges nor is he seeking relief from any sentence of confinement. CS-1 is not cooperating for financial gain. CS-1 voluntarily offered to assist law enforcement in investigating narcotics crimes in Loudoun County. CS-1 is a former heroin customer of CURRY who has been battling addiction. CS-1 has never provided information that law enforcement has found to be false or incomplete. For

conduct a controlled purchase with CURRY, which occurred on May 9, 2016. During that controlled purchase, the CS-1 purchased approximately 1 gram of suspected heroin from CURRY for approximately $240.00. Laboratory testing revealed the substance obtained during the controlled purchase was actually fentanyl, a Schedule II controlled substance. The CDs and CS will be referred to in the masculine regardless of their true genders.

## INTERVIEW OF CD-1

8.      On March 29, 2016, CD-1 was interviewed by investigators at his residence in Round Hill, Virginia. During the interview CD-1 admitted to purchasing heroin from CURRY on more than fifteen occasions. CD-1 believed CURRY was a sub-distributor for other dealers. CURRY charged CD-1 approximately $40.00 for approximately 0.15 grams of heroin. CD-1 admitted to purchasing $275.00 worth of heroin from CURRY and an unindicted co-conspirator (UCC-1) on or about March 18, 2016. CD-1 further admitted to providing a portion of that heroin to a friend, E.L., who died on or about March 18, 2016, after ingesting the heroin CD-1 purchased from CURRY and UCC-1. A subsequent toxicological examination of fluids taken from E.L. confirmed the presence of heroin.

9.      Before the March 29, 2016, interview, CD-1 agreed to conduct a controlled purchase with CURRY. CD-1 attempted to arrange this controlled purchases through text messages sent over a cellular telephone.

10.     On April 19, 2016, law enforcement examined text messages on CD-1's cellular telephone with CURRY. CD-1 engaged in these communications at the direction of law enforcement. Leesburg Police Department detectives obtained a Commonwealth of Virginia search warrant on April 19, 2016, for CD-1's cellular telephone. All text messages obtained from

---

these reasons, I consider CS-1 reliable.

the search warrant were at the direction of LCSO attempting to conduct a controlled purchase with CURRY. The following is an excerpt of the conversation between CURRY and CD-1 on March 23, 2016:

> CURRY: Stop giving attitude [CD-1]
>
> CD-1: What attitude?? Smh
>
> CD-1: Dude what's up with [UCC-1]? Is he ok?
>
> CD-1: Well since [UCC-1] is totally faking on me for some reason can I get something off you?
>
> CD-1: ?????
>
> CURRY: Why are you blowing me up people's phones looking for me dude?
>
> CURRY: I'm not [UCC-1]
>
> CD-1: What? I'm just trying to cop something
>
> CURRY: I'll trade for addies
>
> CD-1: Really I don't have many left but I got cash
>
> CURRY: what do you need
>
> CD-1: What you want for a g?
>
> CURRY: 240
>
> CD-1: Damn that's steep... Well someone just hit me back that's available now so ima grab something small to get me by tonight but I can meet up with you tomorrow like for sure? I know you got the good shit lol

11.     Based on my training and experience, and knowledge of the case, I believe CD-1 and CURRY were arranging a transaction for approximately 1 gram of heroin for $240.00 after

CD-1 could not reach UCC-1. I further believe that CD-1 believed that CURRY would provide powerful heroin.

12. The following is an excerpt of the conversation between CD-1 and CURRY from March 26, 2016:

CURRY: I've got some of that really good shit

CURRY: Heard [UCC-1] blocked you lol

CURRY: So hmu if u want some

CD-1: Wtf why he block me? I'm broke right now but thanks for the heads up

CURRY: Because he said you were blowing him up, being rude as fuck and disrespectful. Said you didn't have any patience and you would like harass him if he didn't come and serve you immediately.

13. Based on my training and experience, and knowledge of the case, I believe UCC-1 informed CURRY that he would no longer deal with CD-1. In response, I believe CURRY offered to provide CD-1 heroin.

14. The following is an excerpt of the conversation between CD-1 and CURRY from March 28, 2016:

CURRY: Do u want anything

CURRY: I have that everybody overdosing type shit

15. Based on my training and experience, and knowledge of the case, CURRY offered to sell CD-1 heroin that was powerful enough to cause an overdose.

16. The following is an excerpt of the conversation between CD-1 and CURRY from April 4, 2016:

CURRY: Hey

CURRY: I got dope

CURRY: GOOD dope.  Way better shit than you've ever gotten from me before

CURRY: [CD-1]

CURRY: Do u want anything

CURRY: Are you getting my texts?

17.     Based on my training and experience, and knowledge of the case, I believe CURRY was, again, offering to sell CD-1 strong heroin.

## INTERVIEW WITH CD-2

18.     On or about March 1, 2016, law enforcement interviewed CD-2 in Leesburg, Virginia.  CD-2 told LPD Detectives he had purchased heroin from CURRY between February 29, 2016 and March 1, 2016.  CD-2 later admitted to providing a portion of the substance he obtained from CURRY to a friend, J.C., who died on or about March 1, 2016, after ingesting that substance.  A subsequent toxicological examination of fluids taken from J.C. confirmed the presence of fentanyl.

19.     CD-2 admitted that he provided CURRY $100.00 for approximately 0.4 grams of suspected heroin. Before the purchase, CD-2 used a portion of the substance he obtained from CURRY at CURRY's residence in Leesburg, Virginia, and lost consciousness.  CD-2 did so at CURRY's insistence. CD-2 admitted that when he regained consciousness, he was on the outdoor steps leading to CURRY's basement.  CD-2 believes that after he lost consciousness, CURRY dragged him from the residence and placed him outside. Investigators photographed injuries, including scrapes to CD-2's back and legs, that appear to have resulted from being dragged over concrete.

20.     Once CD-2 awoke, CD-2 left CURRY's residence and provided the substance he

purchased from CURRY to friends, including J.C.

21.     Law enforcement learned CD-2 arranged the heroin transaction with CURRY using

Facebook Messenger. On March 8, 2016, law enforcement obtained a Commonwealth of Virginia

search warrant for both CD-2's and CURRY's Facebook accounts.  With respect to CURRY's

Facebook account, the warrant authorized, *inter alia*, the search and seizure of messages from 5:00

p.m. on February 29, 2016, through 3:00 p.m. on March 1, 2016.  The following is an excerpt of

the messages exchanged by CD-2 and CURRY between February 29, 2016 and March 1, 2016:

CD-2: Word. Well I'm trying to see if you know where anything's at?

CD-2: Dude you can preach to me all you want but whatever I get it. Can you find shit?

And if so are you willing to help me out? No I'm the one who went out to find it and put

the needle in my arm.

CD-2: I'm looking for a gram

CURRY: I dont like people popping up out of the blue that I havent fucked with in years

CURRY: normally in loudoun county when this kinda thing happens it someone getting

set up

CURRY: i dont really have a g like that

CURRY: just how much are u tryin

CURRY: to spend

CD-2: I get it I really do. I have been in st Augustine Florida for rehab. I'm tryin to spend

$100

CURRY: aight

CURRY: well I cant give u a g for that

CD-2: What can you do?

CURRY: u can come through with that and get .4

CURRY: im in woodlea

CD-2: For 100?

CD-2: The most I'll do for that is 60

CURRY: alrighty

CURRY: lol

CD-2: So 60

CURRY: no

CURRY: just lemme know if u want what I said

CD-2: You really want 100 for .4?

CURRY: yes

CURRY: were not in the city dude

CD-2: Aware

CURRY: im not trying to sell .4 for 60 and not actually profit

CD-2: What about 80?

CURRY: its not some bullshit shitty dope either…and it's on point

CURRY: do u have 0 tolerance right now?

CURRY: if your tolly is at 0 then .4 will give you 4 nice ass shots

CURRY: in fact I would prefer to be there with you when you do ur first shot

CURRY: just come on and ill give u something worth your while for 100 dude

CD-2: Alright

CD-2: I'll be there in 10

CURRY: ur not a fucking snitch right

CD-2: Nah dud lol

22.     Based on my training and experience, and knowledge of the case, I believe CD-2 and CURRY were arranging a transaction for approximately 0.4 grams of heroin for $100.00. I further believe that this transaction was to occur at CURRY's home in Woodlea Manor, a neighborhood in Leesburg, Virginia. I further believe CURRY established his quoted price in order to make a profit from the sale of this substance. I further believe that CURRY believed his product was strong.

**INTERVIEW OF CS-1 AND CONTROLLED PURCHASE WITH CURRY**

23.     In or around April 2016, law enforcement began working with a confidential source (CS-1) who claimed to have purchased heroin from CURRY in the past. CS-1 agreed to conduct a controlled purchase with CURRY.

24.     On May 9, 2016, at law enforcement's direction, CS-1 arranged to purchase approximately 1 gram of heroin from CURRY for approximately $240.00. The CS contacted CURRY over text messages to arrange the purchase. The following was discussion between the CS and CURRY beginning on May 8, 2016 and ending on May 9, 2016:

CS: Think you'll be good tomorrow?

CURRY: Ya

CS: Could you do something early? Like 11?

CS: ?

CS: What's up man?

CS: I have a limited window tomorrow but would like to get a gram. Let me know if 11am works.

CURRY: Ya ok

CURRY: A gram is gna cost 240 though

CS: Word. No problem. I'll hit you up when I'm headed your way.

25.     Based on my training and experience, and knowledge of the case, I believe CURRY agreed to provide 1 gram of heroin to the CS for $240. CS-1 agreed to contact CURRY when the CS was in the area.

26.     On May 9, 2016, law enforcement met with CS-1 prior to the transaction. After searching him and his vehicle for contraband (with negative results) law enforcement provided CS-1 with $240.00 to effectuate the purchase. Law enforcement established surveillance at the suspected location of the deal, which was to occur at CURRY's family residence at or near 635 Meade Drive, SW, Leesburg, Virginia. On May 9, 2016, CS-1 and CURRY exchanged the following text messages:

CS-1: Leaving soon. You up?

CS-1: Yo What's up??

CS-1: You said you could do something at 11. I'm about to leave bro.

CS-1: I don't have much time

CS-1: Wake up son!

CS-1: Riley. Come on man

CS-1: Riley!

CS-1: Yo!

CS-1: Hit me up

CS-1: Hit me up as soon as you wake up man.

CURRY: C'mon through

CS-1: Cool. Gimmie 15

CS-1: Yo. I'm here

CS-1: What's up

CURRY: If you start doing this shit again then you can sit and wait longer its no skin off my teeth

CS-1: All right bro. Damn.

CS-1: I'm here. Whenever your ready

CURRY: I'm just waiting for my dad to go downstairs

CS-1: K

CURRY: Just pull right up behind my car

27.     On May 9, 2016, law enforcement conducted surveillance during the transaction between CS-1 and CURRY. Surveillance units observed CURRY exit the residence at 635 Meade Drive, SW, Leesburg, Virginia, and meet with CS-1 at his vehicle. Law enforcement watched CS-1 and CURRY conduct a hand-to-hand transaction, and then observed CURRY return inside the residence. The deal was captured by video surveillance.

28.     Law enforcement met with CS-1 following the transaction. CS-1 provided law enforcement the substance he obtained from CURRY and confirmed that the individual who provided the substance was, in fact, CURRY. Subsequent laboratory testing revealed that the substance obtained during the controlled purchase was approximately 1 gram of fentanyl.

## Jail Calls Regarding CURRY's use of Facebook

29.     In August 2017, the Loudoun County Sherriff's Department arrested CURRY for a state felony drug distribution offense. Thereafter, CURRY was—and remains—detained at the Loudoun County Adult Detention Center. CURRY pled guilty to that charge in Loudoun County Circuit Court and is awaiting sentencing, which is scheduled for April 30, 2018.

30.     On or about March 28, 2018, the Loudoun County Adult Detention Center provided law enforcement with two discs containing CURRY's recorded jail calls. These discs were provided pursuant to a subpoena issued by the grand jury sitting in the U.S. District Court for the Eastern District of Virginia. I have listened to the calls contained on these discs.

31.     On or about August 24, 2017, CURRY made a recorded call from Loudoun County Adult Detention Center to a woman, suspected to be his girlfriend, at telephone number 703-939-4492. Therein CURRY and his suspected girlfriend discussed CURRY's Facebook account. At one point during the call, CURRY said he did not want anyone "intercepting [the] information" on his Facebook account. In response, CURRY's suspected girlfriend said she would "go ahead and delete it." CURRY agreed with this plan, calling it a "good idea." During this same recorded telephone call, CURRY's suspected girlfriend commented that she was glad she still had a Virginia telephone number so CURRY would not get charged for calling her in New York.

32.     On or about August 25, 2017, CURRY made another recorded call from the Loudoun County Adult Detention Center to telephone number 703-939-4492. Having listened to numerous calls between CURRY and the user of telephone number 703-939-4492, I believe the speakers were same two people that participated in the August 24, 2017, call. During the call on August 25, 2017, CURRY's suspected girlfriend claimed that she "logged into your [CURRY's] Facebook yesterday." She went on to say "for you . . . that needed to be deactivated . . . I'm sure some has already been printed off and has been seen but those messages were not good." CURRY briefly interrupted, after which his suspected girlfriend continued "and you've got years of it on there. Nothing was deleted." Later in the conversation, when discussing specific communications, CURRY's suspected girlfriend said, "I deactivated your account."

33.     On or about August 27, 2017, CURRY made another recorded call from the Loudoun County Adult Detention Center to telephone number 703-939-4492.  Again, having listened to numerous calls between CURRY and the user of telephone number 703-939-4492, I believe the speakers were the same two people that participated in the August 24 & 25, 2017, calls.  During the call on August 27, 2017, CURRY's suspected girlfriend commented that she was walking down the street in Astoria.  Based on my knowledge of this investigation, I believe she referencing the fact that she was in the neighborhood of Astoria in the Borough of Queens in New York City.

34.     On or about August 31, 2017, CURRY made another recorded call from the Loudoun County Adult Detention Center to telephone number 703-939-4492.  Again, having listened to numerous calls between CURRY and the user of telephone number 703-939-4492, I believe the speakers were the same two people that participated in the August 24 & 25, 2017, calls.  During the call on August 31, 2017, CURRY asked his suspected girlfriend if his Facebook account was "shut down."   In response, his suspected girlfriend said "I did it."

35.     Based on my training and experience and knowledge of this investigation, I believe CURRY's girlfriend—the user of telephone number 703-939-4492—logged into CURRY's Facebook account and saw numerous messages related to CURRY's narcotics trafficking activities.  I further believe that CURRY's girlfriend deactivated, or attempted to deactivate, CURRY's Facebook account to prevent law enforcement from obtaining those messages.  I further believe that CURRY's girlfriend did so with CURRY's approval.  I further believe that CURRY's girlfriend did this in and around New York City, New York.

## Evidence Linking Targets to Facebook Accounts for Which Records are Sought

24.     Based on a Commonwealth of Virginia search warrant obtained on March 8, 2016, for both CD-2's and CURRY's Facebook accounts related to their Facebook messages from March 1, 2016, I know that CURRY maintained a Facebook account with vanity name "Riley Curry." The Uniform Resource Locator (URL), commonly known as the web address, for the Facebook page maintained under the vanity name "Riley Curry" is www.facebook.com/riley.curry.10.

25.     Law enforcement has also sent letters to Facebook asking that company to preserve all records for each of the Facebook accounts identified in Attachment A on February 23, 2018.

26.     The Facebook Account has recently been viewed by law enforcement, and the account appears to be active.

**Execution of Search Warrant on Facebook Account Associated with "Riley Curry."**

27.     On April 19, 2018, the Honorable John F. Anderson, United States Magistrate Judge for the Eastern District of Virginia, issued a warrant that compelled Facebook to provide information associated with the vanity name "Riley Curry" found at www.facebook.com/riley.curry.10 ("the account") (18-sw-208).  On May 25, 2018, Facebook provided information pursuant to the warrant, including records of IP addresses associated with access to the account.  These records show that on August 24, 2017, there was a login to the account at approximately 9:21 p.m. UTC in New York City, New York—specifically at or near Manhattan—associated with IP address 70.214.127.30.  A database query revealed that this IP address is associated with a Verizon wireless account.  Furthermore, these records also showed that on August 25, 2017, there was an additional login to the account at approximately 4:28 p.m. UTC in New York City, New York—specifically at or near the Astoria neighborhood of Queens—associated with IP address 72.89.154.243.  A database query revealed that this IP address is associated with a Verizon Fios account.  Law enforcement has issued administration

subpoenas to Verizon Wireless and Verizon Fios for information associated with these IP addresses. That information is not yet available. Based on my knowledge of this investigation, I believe that CURRY's suspected girlfriend was living in or near New York City, likely in the vicinity of the Astoria neighborhood of Queens, in August 2017. Therefore, I believe these IP addresses resulted from, and confirm, CURRY's suspected girlfriend's attempts to access the account on CURRY's behalf.

28.     Facebook did not provide information regarding the account's activation, deactivation, deletion, or disabling history because it claims the initial warrant did not compel the production of this information.   I seek this warrant to facilitate the production of that information.

## GENERAL FACEBOOK ACCOUNT INFORMATION

29.     Facebook owns and operates a free-access social networking website of the same name that can be accessed at http://www.facebook.com. Facebook allows its users to establish accounts with Facebook, and users can then use their accounts to share written news, photographs, videos, and other information with other Facebook users, and sometimes with the general public.

30.     Facebook asks users to provide basic contact and personal identifying information to Facebook, either during the registration process or thereafter. This information may include the user's full name, birth date, gender, contact e-mail addresses, Facebook passwords, physical address (including city, state, and zip code), telephone numbers, screen names, websites, and other personal identifiers. Facebook also assigns a user identification number to each account.

31.     Facebook users may join one or more groups or networks to connect and interact with other users who are members of the same group or network. Facebook assigns a group

identification number to each group. A Facebook user can also connect directly with individual Facebook users by sending each user a "Friend Request." If the recipient of a "Friend Request" accepts the request, then the two users will become "Friends" for purposes of Facebook and can exchange communications or view information about each other. Each Facebook user's account includes a list of that user's "Friends" and a "News Feed," which highlights information about the user's "Friends," such as profile changes, upcoming events, and birthdays.

32.    Facebook users can select different levels of privacy for the communications and information associated with their Facebook accounts. By adjusting these privacy settings, a Facebook user can make information available only to himself or herself, to particular Facebook users, or to anyone with access to the Internet, including people who are not Facebook users. A Facebook user can also create "lists" of Facebook friends to facilitate the application of these privacy settings. Facebook accounts also include other account settings that users can adjust to control, for example, the types of notifications they receive from Facebook.

33.    Facebook users can create profiles that include photographs, lists of personal interests, and other information. Each Facebook user profile page includes a list of the user's "friends" along with links to the friends' Facebook profile pages. Facebook users can adjust the privacy settings of their profiles so their profile information is visible only to their Facebook "friends."

34.    Facebook users can also post "status" updates about their whereabouts and actions, as well as links to videos, photographs, articles, and other items available elsewhere on the Internet. Facebook users can also post information about upcoming "events," such as social occasions, by listing the event's time, location, host, and guest list. In addition, Facebook users can "check in" to particular locations or add their geographic locations to their Facebook posts,

thereby revealing their geographic locations at particular dates and times. A particular user's profile page also includes a "Wall," which is a space where the user and his or her "Friends" can post messages, attachments, and links that will typically be visible to anyone who can view the user's profile.

35.     Facebook allows users to upload photos and videos, which may include any metadata such as location that the user transmitted when s/he uploaded the photo or video. It also provides users the ability to "tag" (i.e., label) other Facebook users in a photo or video. When a user is tagged in a photo or video, he or she receives a notification of the tag and a link to see the photo or video. For Facebook's purposes, the photos and videos associated with a user's account will include all photos and videos uploaded by that user that have not been deleted, as well as all photos and videos uploaded by any user that have that user tagged in them.

36.     Facebook users can exchange private messages on Facebook with other users. Those messages are stored by Facebook unless deleted by the user. Facebook users can also post comments on the Facebook profiles of other users or on their own profiles; such comments are typically associated with a specific posting or item on the profile. In addition, Facebook has a chat feature that allows users to send and receive instant messages through Facebook Messenger. These chat communications are stored in the chat history for the account. Facebook also has Video and Voice Calling features, and although Facebook does not record the calls themselves, it does keep records of the date of each call.

37.     If a Facebook user does not want to interact with another user on Facebook, the first user can "block" the second user from seeing his or her account.

38.     Facebook has a "like" feature that allows users to give positive feedback or connect to particular pages. Facebook users can "like" Facebook posts or updates, as well as

18

webpages or content on third-party (*i.e.*, non-Facebook) websites. Facebook users can also become "fans" of particular Facebook pages.

39. Facebook has a search function that enables its users to search Facebook for keywords, usernames, or pages, among other things.

40. Each Facebook account has an activity log, which is a list of the user's posts and other Facebook activities from the inception of the account to the present. The activity log includes stories and photos that the user has been tagged in, as well as connections made through the account, such as "liking" a Facebook page or adding someone as a friend. The activity log is visible to the user but cannot be viewed by people who visit the user's Facebook page.

41. Facebook also has a Marketplace feature, which allows users to post free classified ads. Users can post items for sale, housing, jobs, and other items on the Marketplace.

42. In addition to the applications described above, Facebook also provides its users with access to thousands of other applications ("apps") on the Facebook platform. When a Facebook user accesses or uses one of these applications, an update about that the user's access or use of that application may appear on the user's profile page.

43. Facebook also retains Internet Protocol ("IP") logs for a given user ID or IP address. These logs may contain information about the actions taken by the user ID or IP address on Facebook, including information about the type of action, the date and time of the action, and the user ID and IP address associated with the action. For example, if a user views a Facebook profile, that user's IP log would reflect the fact that the user viewed the profile, and would show when and from what IP address the user did so.

44. Social networking providers like Facebook typically retain additional information about their users' accounts, such as information about the length of service (including start date),

19

the types of service utilized, and the means and source of any payments associated with the service (including any credit card or bank account number). In some cases, Facebook users may communicate directly with Facebook about issues relating to their accounts, such as technical problems, billing inquiries, or complaints from other users. Social networking providers like Facebook typically retain records about such communications, including records of contacts between the user and the provider's support services, as well as records of any actions taken by the provider or user as a result of the communications.

45.     As explained herein, information stored in connection with a Facebook account may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion. In my training and experience, a Facebook user's IP log, stored electronic communications, and other data retained by Facebook, can indicate who has used or controlled the Facebook account. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, profile contact information, private messaging logs, status updates, and tagged photos (and the data associated with the foregoing, such as date and time) may be evidence of who used or controlled the Facebook account at a relevant time. Further, Facebook account activity can show how and when the account was accessed or used. For example, as described herein, Facebook logs the Internet Protocol (IP) addresses from which users access their accounts along with the time and date. By determining the physical location associated with the logged IP addresses, investigators can understand the chronological and geographic context of the account access and use relating to the crime under investigation. Such information allows investigators to understand the geographic and chronological context of Facebook access,

use, and events relating to the crime under investigation. Additionally, Facebook builds geo-location into some of its services. Geo-location allows, for example, users to "tag" their location in posts and Facebook "friends" to locate each other. This geographic and timeline information may tend to either inculpate or exculpate the Facebook account owner. Last, Facebook account activity may provide relevant insight into the Facebook account owner's state of mind as it relates to the offense under investigation. For example, information on the Facebook account may indicate the owner's motive and intent to commit a crime (e.g., information indicating a plan to commit a crime), or consciousness of guilt (e.g., deleting account information in an effort to conceal evidence from law enforcement).

46.     Therefore, the computers of Facebook are likely to contain all the material described above, including stored electronic communications and information concerning subscribers and their use of Facebook, such as account access information, transaction information, and other account information.

## INFORMATION TO BE SEARCHED AND THINGS TO BE SEIZED

47.     I anticipate executing this warrant under the Electronic Communications Privacy Act, in particular 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A), by using the warrant to require Facebook to disclose to the government copies of the records and other information (including the content of communications) particularly described in Section I of Attachment B. Upon receipt of the information described in Section I of Attachment B, government-authorized persons will review that information to locate the items described in Section II of Attachment B.

## CONCLUSION

48.     Based on the forgoing, I request that the Court issue the proposed search warrant.

21

49.     This Court has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711.  18 U.S.C. §§ 2703(a), (b)(1)(A) & (c)(1)(A).  Specifically, the Court is "a district court of the United States . . . that – has jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i).

50.     Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for the service or execution of this warrant.

Special Agent Paul Fisher
Federal Bureau of Investigation

Subscribed and sworn to me this ___ day of June, 2018.

_____/s/_____
Michael S. Nachmanoff
United States Magistrate Judge
The Honorable Michael S. Nachmanoff
United States Magistrate Judge
Eastern District of Virginia

22

## ATTACHMENT A

### Property to Be Searched

This warrant applies to information associated with the Facebook Inc. ("Facebook")

accounts identified below, for the period January 1, 2016, to April 16, 2018, that is stored at

premises owned, maintained, controlled, or operated by Facebook, a company headquartered in

Menlo Park, California.

| Facebook Account and URL |
| --- |
| Facebook Account: "Riley Curry"<br>URL: www.facebook.com/riley.curry.10 |

## **ATTACHMENT B**

### **Particular Things to be Seized**

I.    Information to be disclosed by Facebook

To the extent that the information described in Attachment A is within the possession, custody, or control of Facebook Inc. ("Facebook"), including any messages, records, files, logs, or information that have been deleted but are still available to Facebook, or have been preserved pursuant to a request made under 18 U.S.C. § 2703(f), Facebook is required to disclose the following information to the government for each account listed in Attachment A and for the time period provided in Attachment A:

(a)    All contact and personal identifying information, including full name, user identification number, birth date, gender, contact e-mail addresses, physical address (including city, state, and zip code), telephone numbers, screen names, websites, device identifiers, and other personal identifiers.

(b)    All activity logs for the account and all other documents showing the user's posts and other Facebook activities;

(c)    All photos and videos uploaded by the user of the account and all photos and videos uploaded by any user that have that user tagged in them, including Exchangeable Image File ("EXIF") data and any other metadata associated with those photos and videos;

(d)    All profile information; News Feed information; status updates; videos, photographs, articles, and other items; Notes; Wall postings; friend lists, including the friends' Facebook user identification numbers; groups and networks of which the user is a member, including the groups' Facebook group identification numbers; future and past event postings; rejected "Friend" requests; comments; gifts; pokes; tags; and information about the user's access and use of Facebook applications;

(e)    All other records of communications and messages made or received by the user, including all private messages, chat history, video calling history, and pending "Friend" requests;

(f)     All "check ins" and other location information;

(g)     All IP logs, including all records of the IP addresses that logged into the account; all device identifier logs, including all records of the device identifiers that logged into the account;

(h)     All records of the account's usage of the "Like" feature, including all Facebook posts and all non-Facebook webpages and content that the user has "liked;"

(i)     All information about the Facebook pages that the account is or was a "fan" of;

(j)     All past and present lists of friends created by the account;

(k)     All records of Facebook searches performed by the account;

(l)     All information about the user's access and use of Facebook Marketplace;

(m)     The types of service utilized by the user;

(n)     The length of service (including start date) and the means and source of any payments associated with the service (including any credit card or bank account number);

(o)     All privacy settings and other account settings, including privacy settings for individual Facebook posts and activities, and all records showing which Facebook users have been blocked by the account; and

(p)     All records pertaining to communications between Facebook and any person regarding the user or the user's Facebook account, including contacts with support services and records of actions taken.

(q)     All dates when the account was reactivated, deactivated, disabled, or deleted.

II.     <u>Information to be seized by the government</u>

All information described above in Section I that constitutes evidence of violations of Title

21, United States Code, Sections 841(a)(1) and 846, and Title 18, United States Code, Sections 2

& 1512(c), including, for each account identified in Attachment A, information pertaining to the

following matters:

    (a)    Communications, images, or information reflecting the planning or distribution of heroin, fentanyl, or any additional illegal narcotic;

    (b)    Address/phone books or contact information that reflect names of potential criminal associates involved in the conspiracy;

    (c)    Financial account information and records related to planning or distribution of controlled substances, including, but not limited to, heroin and fentanyl;

    (d)    Evidence indicating how and when the Facebook account was accessed or used, to determine the chronological and geographic context of account access, use, and events relating to the crime under investigation and to the Facebook account owner;

    (e)    Evidence indicating the Facebook account owner's state of mind as it relates to his involvement in a conspiracy to distribute controlled substances;

    (f)    The identity of the person(s) who created or used the Facebook account, including records that may help reveal their whereabouts;

    (g)    The identity of co-conspirators, accomplices, and aiders and abettors in the commission of the criminal activity under investigation;

    (h)    Images or videos related to the planning or distribution of controlled substances, including, but not limited to, heroin and fentanyl.